## IN THE INTERMEDIATE COURT OF APPEALS OF WEST VIRGINIA

**WEST VIRGINIA DEPARTMENT OF TRANSPORTATION,**
**Employer Below, Petitioner**

**FILED**
**June 30, 2026**

ASHLEY N. DEEM, CHIEF DEPUTY CLERK
INTERMEDIATE COURT OF APPEALS
OF WEST VIRGINIA

**v.) No. 25-ICA-458**          (JCN: 2024021518)

**DENNIS THORN,**
**Claimant Below, Respondent**

### MEMORANDUM DECISION

Petitioner West Virginia Department of Transportation ("WVDOT") appeals the November 3, 2025, order of the Workers' Compensation Board of Review ("Board").[1] Respondent Dennis Thorn timely filed a response. WVDOT did not reply. The issue on appeal is whether the Board erred in reversing the claim administrator's order, which rejected the claim.

This Court has jurisdiction over this appeal pursuant to West Virginia Code § 51-11-4 (2024). After considering the parties' arguments, the record on appeal, and the applicable law, this Court finds no substantial question of law and no prejudicial error. For these reasons, a memorandum decision affirming the Board's order is appropriate under Rule 21 of the West Virginia Rules of Appellate Procedure.

Mr. Thorn filed an Employees' and Physicians' Report of Occupational Injury or Disease dated March 28, 2024, indicating that he suffered from an occupational disease with a date of last exposure of March 1, 2014. Mr. Thorn indicated that he was employed by WVDOT for thirty-six years and was exposed to several chemicals, including, but not limited to paint, toluene, weed killer, diesel fuel and diesel exhaust fumes, gasoline and gasoline exhaust fumes, and aromatic hydrocarbon-containing products and/or chlorinated hydrocarbon-containing products. Mr. Thorn alleged that he developed bladder cancer and kidney urothelial cancer as a result of these continuous occupational exposures. The physician's section of the claim application was completed by Mohamad W. Salkini, M.D., on April 8, 2024. Dr. Salkini indicated that he first treated Mr. Thorn on December 18, 2019, and he diagnosed Mr. Thorn with an occupational disease resulting in bladder cancer and kidney urothelial cancer.

---

[1] WVDOT is represented by Melissa M. Stickler, Esq. Mr. Thorn is represented by R. Dean Hartley, Esq.

On January 26, 2024, Jeffrey Kady, MS, MBA, authored a "Verified Statement Pursuant to W. Va. Code § 23-4-2(d)(2)(C)." Mr. Kady stated that he has twenty-five years of comprehensive occupational health and safety experience in private industry, consulting, governmental, and emergency services organizations. Further, Mr. Kady stated that he has been involved in environmental remediation, training, auditing, regulatory compliance, EHSS program review and oversight, job hazard analysis, risk assessments, site safety, behavior-based safety assessments, hazardous material training and evaluations, and industrial hygiene services. Mr. Kady reviewed Mr. Thorn's work history with WVDOT, including his repeated and prolonged dermal contact with and respiratory exposure to gasoline fumes, diesel fumes, paint, paint fumes, toluene, toluene fumes, Oakite, Oakite fumes, tar, tar fumes, weed killer, and weed killer fumes. Mr. Kady opined that Mr. Thorn was exposed to elevated levels of harmful gasoline fumes while the compressor ran and thereafter, when driving trucks, and was heavily exposed to diesel exhaust, asphalt fumes, and tar for approximately twenty-four years.

Dr. Salkini authored a letter dated April 1, 2024, stating that he first saw Mr. Thorn for a second opinion on December 18, 2019, regarding his diagnosis of bladder cancer and hydronephrosis. Dr. Salkini noted that Mr. Thorn underwent transurethral resection of a bladder tumor prior to his first visit, and the pathology revealed urothelial carcinoma (bladder cancer). Mr. Thorn had multiple recurrences and underwent multiple surgical resections. Mr. Thorn's right kidney lost its function due to chronic obstruction by multiple kidney and ureteral tumors. Mr. Thorn underwent radical nephroureterectomy on September 21, 2020, and the final pathology revealed multiple urothelial cancers involving the kidney and ureter. Dr. Salkini stated that due to the high-grade nature of the recurrent tumors and the many recurrences, Mr. Thorn agreed to undergo a radical cystoprostatectomy with urinary diversion, a major life-changing surgery, performed by Dr. Salkini on March 9, 2022.

In his April 1, 2024, letter, Dr. Salkini stated that Mr. Thorn had occupational exposure to paint fumes, paint, thinners, toluene, and gasoline fumes as paint was sprayed a few feet from his buggy chair. Dr. Salkini further noted that Mr. Thorn never smoked and had no family history of urothelial cancer; however, he did have a long history of occupational exposure to carcinogens while working for WVDOT from 1978 to 2014. Dr. Salkini further stated that Mr. Thorn had significant occupational exposure to various chemicals and their fumes. Dr. Salkini stated that it is well known that certain industrial chemicals have been linked bladder cancer. Industries with higher risks of bladder cancer include makers of rubber, leather, textiles, and paint products, as well as printing companies. Dr. Salkini opined that Mr. Thorn's prolonged occupational exposures to industrial chemicals and fumes while working for the WVDOT between 1978 and 2014 caused him to develop bladder and kidney urothelial cancer at a young age. Specifically, Dr. Salkini opined to a reasonable medical probability that Mr. Thorn's occupational exposures to paint, paint fumes, thinners, toluene, gasoline fumes, diesel exhaust, asphalt

fumes, and tar were contributing causes of his development of bladder and kidney urothelial cancer.

The claim administrator issued an order dated June 8, 2024, which rejected the claim based on findings that the claim was untimely filed, and that Mr. Thorn did not sustain an injury in the course of and resulting from his employment. Mr. Thorn protested this order.

On August 28, 2024, Mr. Thorn was deposed and testified that he worked for the WVDOT Division of Highways ("DOH") for approximately thirty-six years, retiring from the agency in 2014. Mr. Thorn stated that his first job with the WVDOT was to follow a paint truck and put up signs, which he did for about twelve years. Mr. Thorn testified that he later changed to a new job that involved a variety of different tasks, including salting and cindering roads, killing weeds, putting up guardrails, patching holes, and tarring and chipping roads. In the winter months, Mr. Thorn stated that he would salt and cinder roads for twelve hours a day, and in the summer months, he would patch roads, spray weeds, and tar and chip roads. Mr. Thorn testified that, over the course of his thirty-six years with the DOH, he spent most of his time running a paint machine and working on snow removal. Mr. Thorn testified that he would sit on a seat on the back of the paint truck with the nozzle of the paint gun positioned directly underneath him, and he would use the paint gun to spray lines on the road. Mr. Thorn further testified that he could smell the paint, the paint would get on him, and that the job could not be performed without getting some paint on oneself. Mr. Thorn stated that he sometimes drove the truck that followed the paint truck (the follow truck) to keep cars off the fresh paint. Mr. Thorn further stated that sometimes he would sit on the bumper of the follow truck to place or pick up road cones; he said he could smell the fresh paint while placing or picking up the cones; and it was impossible to avoid getting paint on himself while performing this job. Mr. Thorn could not state with any certainty how many hours a day he used the paint sprayer.

Mr. Thorn testified that, after every use of the paint sprayer, it would have to be washed by spraying toluene through it and onto the road. Mr. Thorn stated that sometimes the toluene would get on his hands and he could smell it, but he could not state with any certainty how many times a day he cleaned the sprayer with toluene. Mr. Thorn testified that at the beginning of his shift on the paint truck, he would fill the truck with paint and toluene by sticking a hose into a fifty-five-gallon drum of paint and pumping it into a tank on the paint truck. Mr. Thorn testified that he would stand over the paint drum to make sure the paint did not overflow and get all over the truck, and the toluene was handled the same way. Mr. Thorn further testified that, while filling up the truck tanks with paint, the paint would sometimes get on him, and he used a rag with toluene on it to remove the paint. Mr. Thorn stated that he was not aware of the hazard presented by toluene at the time. Mr. Thorn further stated that, at the end of the summer painting season, he and the other workers would run toluene through all the drums and lines to clean the equipment. Mr. Thorn testified that, after he changed jobs, his duties included spraying Roundup/pesticides to kill

3

weeds and tar and chip work. Mr. Thorn stated that he would use a pump and sprayer to spray the pesticide on weeds. If it were a large area of weeds, Mr. Thorn stated that there was a plastic tank on the back of a truck that housed the pesticide, and the driver of the truck would push a button to spray the pesticide around fence lines and other areas. Mr. Thorn testified that he sometimes operated a truck that followed the pesticide sprayer, and he could smell the pesticide while driving the follow truck. Mr. Thorn testified that he helped fill the truck tanks with pesticide and water. Mr. Thorn testified that he also used Roundup around his house.

Mr. Thorn testified that he did not wear any respiratory equipment while performing his job duties, and it was never recommended that he do so. Mr. Thorn stated that he decided to consult an attorney about filing a civil lawsuit after seeing a commercial on TV advertising legal claims related to Roundup and Camp Lejeune, which made him think of his occupational exposures while working for the DOH. Mr. Thorn testified that he did not realize that there was a connection between his cancer and his employment until he saw these commercials for the first time in March 2022. Mr. Thorn testified that he has no family history of cancer, and he is not a smoker, but he described himself as an occasional drinker.

Syam Stoll, M.D., authored a record review report dated November 25, 2024, in which he was asked to offer an opinion on Mr. Thorn's occupational disease claim based upon records provided by WVDOT. Based upon his review of the records provided, Dr. Stoll opined to a reasonable degree of medical probability that Mr. Thorn's diagnosis of bladder and kidney cancer was not related to his occupational exposures at work. Dr. Stoll found that Mr. Thorn's occupational history was based on his subjective recollection and self-report, and Dr. Stoll was not provided with any verification of Mr. Thorn's alleged work exposures. Further, Dr. Stoll alleged that multiple governmental and non-governmental regulatory organizations do not classify toluene as a human carcinogen. Dr. Stoll was of the opinion that Mr. Thorn's testimony that he slept in a garage with running trucks is not credible. Dr. Stoll further opined that Dr. Salkini's opinion is based solely upon Mr. Thorn's subjective reports without any valid objective documentation regarding his occupational exposures.

On December 18, 2024, Dr. Salkini was deposed and testified that he is a board-certified urologist who began treating Mr. Thorn in late 2019 for recurrent bladder cancer and an obstructed right kidney. Dr. Salkini stated that it was discovered that Mr. Thorn's right kidney was obstructed by a cancerous tumor, which caused the kidney to lose function, and required surgery to remove the cancerous tumor from Mr. Thorn's bladder. Dr. Salkini testified that he later performed surgery to remove Mr. Thorn's non-functioning kidney, ureter, and part of the bladder. Dr. Salkini stated that Mr. Thorn's bladder cancer returned, and he performed a surgical procedure to remove Mr. Thorn's bladder. Dr. Salkini testified that, from December 2019 through March 2022, his focus was on treating Mr.

Thorn and not the cause of his cancer. However, Dr. Salkini testified that, after reviewing Mr. Thorn's affidavit regarding his occupational exposures to paint, paint fumes and thinners, toluene, gas fumes, diesel exhaust, asphalt fumes, and tar, he opined to a reasonable degree of medical certainty that Mr. Thorn's occupational exposures had contributed to his development of bladder and kidney cancer.

Dr. Salkini further testified that it is well-known in the medical community that certain industrial chemicals are linked to bladder cancer. Additionally, Dr. Salkini stated that he ruled out non-occupational risk factors in Mr. Thorn's life that are associated with bladder cancer. Dr. Salkini testified that he noted that Mr. Thorn was a nonsmoker and he did not have a medical history of chronic infections. Dr. Salkini stated that bladder cancer is usually not genetic, there is no genetic testing for bladder cancer, and no medications currently in use have been associated with bladder cancer. Further, Dr. Salkini stated that the type of urothelial carcinoma that Mr. Thorn was diagnosed with is not associated with infections. Dr. Salkini testified that there is no known association between obesity and bladder cancer. Dr. Salkini conceded that his findings and conclusions were based upon Mr. Thorn's statements and that there was no objective evidence to quantify his level of occupational exposure. Nevertheless, Dr. Salkini testified that based upon Mr. Thorn's statements, he believed that Mr. Thorn was exposed to sufficient carcinogenic material during his employment to cause bladder and kidney cancer. Dr. Salkini further testified that Mr. Thorn had far more exposure to hazardous chemicals as a result of his occupation than a general member of the public.

Dr. Stoll was deposed on August 20, 2025. Dr. Stoll testified that he is not a urologist, and he has never treated a patient with bladder cancer. According to Dr. Stoll, the records that were provided to him by WVDOT, as well as his review of the relevant medical literature, indicate that there was no objective medical evidence to support a finding that Mr. Thorn's diagnoses of bladder and kidney cancer were causally related to his occupational exposures. Dr. Stoll testified that he was not provided with any documentation from the employer that refuted or discredited the claimant's testimony regarding his occupational exposures. Dr. Stoll indicated that Mr. Thorn's medical records contained no evidence that Mr. Thorn was a smoker, was chronically dehydrated, had arsenic poisoning, had chronic bladder irritations or infections, had a prior history of bladder or urethral cancer, had an inherited bladder mutation or birth defect, or had a genetic abnormality that caused his cancer. Dr. Stoll testified that polyaromatic cyclic hydrocarbons are found in gasoline and fossil fuels and are causally linked to bladder cancer, and that The International Agency for Research on Cancer found that exposure to gasoline is a cause of human bladder cancer. Dr. Stoll stated that he would require objective documentation of Mr. Thorn's occupational exposures before he could reasonably determine whether his work increased his risk of cancer. He further stated that the information provided did not indicate the specific type of chemicals Mr. Thorn was exposed to or how intense or frequent the exposure was.

5

Both Mr. Thorn and WVDOT submitted extensive medical research, articles, and journals related to occupational cancer risk factors. These were reviewed and considered by the Board. Mr. Thorn submitted the following medical literature: Occupation as a Risk Factor for Renal Cell Cancer by Mariusdottir, Elin et al. (2016); Occupational Exposure to Diesel and Gasoline Engine Exhausts and the Risk of Kidney Cancer in Canadian Men, by Peters Cheryl E. et al. (2018); Bladder Cancer Causes, Risk Factors, and Prevention, from the American Cancer Society (2023); Bladder Cancer Causes and Risk Factors, from the National Cancer Institute (2023); Occupational Exposure to Organic Solvents and Risk of Bladder Cancer, by Xie, S. et al. (2024); Occupational Benzene Exposure and Risk of Kidney and Bladder Cancers: A Systematic Review and Meta-Analysis, by Seyyedsalehi, Monireh et al (2024); International Agency for Research on Cancer Monographs Evaluate the Carcinogenicity of Automotive Gasoline and Some Oxygenated Gasoline Additives, by Turner MC et al (2025); and IARC Classifies Automotive Gasoline as Carcinogenic to Humans, by Turner MC et al. (2025).[2] WVDOT submitted the following medical literature: Carbon Monoxide, from the Mayo Clinic; and Toulene.[3]

On November 3, 2025, the Board reversed the claim administrator's order, which rejected the claim. The Board found that the claim was timely filed. The Board further found that Mr. Thorn established by a preponderance of the evidence that his occupational exposure was a contributing factor in his development of bladder and kidney urothelial cancer. WVDOT now appeals the Board's order.

Our standard of review is set forth in West Virginia Code § 23-5-12a(b) (2022), in part, as follows:

> The Intermediate Court of Appeals may affirm the order or decision of the Workers' Compensation Board of Review or remand the case for further proceedings. It shall reverse, vacate, or modify the order or decision of the Workers' Compensation Board of Review, if the substantial rights of the petitioner or petitioners have been prejudiced because the Board of Review's findings are:
>
> (1) In violation of statutory provisions;

---

[2] Mr. Thorn also submitted Carcinogenicity of Auto Gasoline and Some Oxygenated Gas Additives, by Turner MC. et al. (2025); Chemical & Material Hazards, by TheSynergist (2025); and Bladder Cancer Risk Factors by the American Cancer Society to the Board; however, these articles were not included in either party's appendix.

[3] This literature was titled Agency for Toxic Substances and Disease Registry Toxicological Profile of Toulene by WVDOT; however, where this came from, and the author are unclear.

(2) In excess of the statutory authority or jurisdiction of the Board of Review;
(3) Made upon unlawful procedures;
(4) Affected by other error of law;
(5) Clearly wrong in view of the reliable, probative, and substantial evidence on the whole record; or
(6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

Syl. Pt. 2, *Duff v. Kanawha Cnty. Comm'n*, 250 W. Va. 510, 905 S.E.2d 528 (2024).

WVDOT argues that Mr. Thorn untimely filed his claim because 1) it was not filed within three years of his date of last exposure in 2014; and 2) he did not file within three years of when he knew or should have known that the condition was related to his employment. WVDOT argues that Mr. Thorn testified that he discussed the potential cause of his cancer with his physician early in his treatment, but decided to focus on his treatment rather than filing a claim. WVDOT further argues that the exposure alleged by Mr. Thorn falls short of the statutory requirements and of the basic scientific and medical information required to make a causation finding. Finally, WVDOT makes several arguments related to specific medical studies that it alleges the Board did not adequately consider.

West Virginia Code § 23-4-1(f) (2024) provides:

For the purposes of this chapter, occupational disease means a disease incurred in the course of and resulting from employment. No ordinary disease of life to which the general public is exposed outside of the employment is compensable except when it follows as an incident of occupational disease as defined in this chapter. Except in the case of occupational pneumoconiosis, a disease is considered to have been incurred in the course of, or to have resulted from, the employment only if it is apparent to the rational mind, upon consideration of all the circumstances: (1) That there is a direct causal connection between the conditions under which work is performed and the occupational disease; (2) that it can be seen to have followed as a natural incident of the work as a result of the exposure occasioned by the nature of the employment; (3) that it can be fairly traced to the employment as the proximate cause; (4) that it does not come from a hazard to which workmen would have been equally exposed outside of the employment; (5) that it is incidental to the character of the business and not independent of the relation of employer and employee; and (6) that it appears to have had its origin in a risk connected with the employment and to have flowed from that source as a natural consequence, though it need not have been foreseen or expected before its contraction.

7

West Virginia Code § 23-4-1(f) does not require a claimant to prove the conditions of their employment were the exclusive or sole cause of the disease nor does it require a claimant to show that the disease is peculiar to one industry, work environment, or occupation. *See Powell v. State Workmen's Comp. Comm'r.*, 166 W. Va. 327, 273 S.E.2d 832 (1980).

Here, the Board found that Mr. Thorn established by a preponderance of the evidence that his occupational exposure was a contributing factor in his development of bladder and kidney urothelial cancer. The Board noted that Mr. Thorn's testimony was the only evidence regarding the level and frequency of his exposure to cancer-causing chemicals and that such testimony was reliable and credible. On the issue of timeliness, the Board found that Mr. Thorn timely filed his application within three years of being diagnosed with an occupational disease. The Board noted that although Mr. Thorn was diagnosed with cancer in 2019, there is no evidence that he was made aware by a physician that his disease had an occupational cause until April 8, 2024.

The Board found that the weight of the evidence supports a finding that exposure to paint and paint fumes, diesel fumes, and gasoline fumes is capable of causing bladder and kidney cancer. Further, the Board found that medical studies and articles established that gasoline causes cancer of the urinary bladder; diesel engine exhaust and gasoline engine exhaust are classified as carcinogenic to humans; there is sufficient evidence that gasoline exposure causes urinary bladder cancer in adults; the risk of renal cell carcinoma is significantly increased in painters and suggests a link to occupational exposure; men with a high cumulative exposure to both gasoline and diesel exhaust have a 76% increased likelihood of kidney cancer; workers with an increased risk of developing bladder cancer include painters and truck drivers, likely due to exposure to diesel fumes; and risk factors for bladder cancer include exposure to paints and petroleum products.

Additionally, the Board noted that Dr. Salkini, Mr. Thorn's treating urologist, and Mr. Kady, an occupational health and safety expert, both opined that occupational exposure to fumes from gas, diesel, and paint can cause or significantly contribute to the development of bladder and kidney urothelial cancer. The Board further noted that WVDOT and Dr. Stoll referenced studies and articles disputing the role of these materials and chemicals in causing cancer. The Board found that the studies and articles submitted by Mr. Thorn, and the opinions of Dr. Salkini and Mr. Kady, constituted a preponderance of the evidence on this issue. Additionally, the Board found that "[a]t the very least, there is an equal amount of evidentiary weight regarding the role of these substances in causing or contributing to the development of cancer, and pursuant to West Virginia Code § 23-4-1g [(2003)], the resolution most consistent with the claimant's position must be adopted."[4]

---

[4] W. Va. Code § 23-4-1g provides:

The Board specifically found Dr. Salkini's opinions to be more persuasive than Dr. Stoll's because of Salkini's credentials and specialized knowledge as a urologist.

We find no merit in the employer's argument that Mr. Thorn's deposition testimony establishes that he was aware of potential occupational causes early in his treatment, but he chose not to file his claim until much later. Upon review of his deposition testimony, there is no indication that Mr. Thorn was aware of any potential occupational causes of his cancer prior to him discussing it with his physician in 2024. Further, we defer to the Board's credibility determination regarding Mr. Thorn's testimony. *See Martin v. Randolph Cnty. Bd. of Educ.*, 195 W. Va. 297, 306, 465 S.E.2d 399, 408 (1995) ("We cannot overlook the role that credibility places in factual determinations, a matter reserved exclusively for the trier of fact. We must defer to the ALJ's credibility determinations and inferences from the evidence . . .").

We note WVDOT's arguments regarding specific medical studies and articles, and we agree that the Board should have provided more in-depth analysis for all medical literature submitted into the record. However, we conclude that WVDOT's interpretations of the medical literature, and its disagreement with the Board's related findings, do not necessarily mean that the Board erred. Upon review of the medical literature, we cannot conclude that the Board was clearly wrong in finding that the medical literature provided by both parties is of equal evidentiary value. Further, we cannot conclude that the Board was clearly wrong in finding that Mr. Thorn's position should be adopted under West Virginia Code § 23-4-1g. Ultimately, we conclude that the Board was not clearly wrong in finding that Mr. Thorn established by a preponderance of the evidence that his occupational exposure was a contributing factor in his development of bladder and kidney urothelial cancer.

---

(a) For all awards made on or after the effective date of the amendment and reenactment of this section during the year two thousand three, resolution of any issue raised in administering this chapter shall be based on a weighing of all evidence pertaining to the issue and a finding that a preponderance of the evidence supports the chosen manner of resolution. The process of weighing evidence shall include, but not be limited to, an assessment of the relevance, credibility, materiality and reliability that the evidence possesses in the context of the issue presented. Under no circumstances will an issue be resolved by allowing certain evidence to be dispositive simply because it is reliable and is most favorable to a party's interests or position. If, after weighing all of the evidence regarding an issue in which a claimant has an interest, there is a finding that an equal amount of evidentiary weight exists favoring conflicting matters for resolution, the resolution that is most consistent with the claimant's position will be adopted.

As the Supreme Court of Appeals of West Virginia has set forth, "[t]he 'clearly wrong' and the 'arbitrary and capricious' standards of review are deferential ones which presume an agency's actions are valid as long as the decision is supported by substantial evidence or by a rational basis." Syl. Pt. 3, *In re Queen*, 196 W. Va. 442, 473 S.E.2d 483 (1996). With this deferential standard of review in mind, we cannot conclude that the Board was clearly wrong in reversing the claim administrator's order, which rejected the claim.

Accordingly, we affirm the Board's November 3, 2025, order.

Affirmed.

**ISSUED:** June 30, 2026

**CONCURRED IN BY:**

Chief Judge Daniel W. Greear
Judge Charles O. Lorensen
Judge S. Ryan White